Eric Steinmetz v. Brinker International, and Jonathan Franklin is here for Appellant Brinker, Gene Sutton Martin is here for Steinmetz, and once you're all situated there, Mr. Franklin, you may begin. Thank you, Your Honor. May it please the Court, Jonathan Franklin for the Appellant Brinker International. In its unprecedented class certification order, the District Court made three key errors of law, any one of which is sufficient to warrant decertification. First, the Court certified classes despite no evidence that more than one or two people even arguably have standing under this Court's decision in Sal. Second, even if one were to assume for the sake of argument that the District Court's standing theory were correct, the Court violated or contravened, the Court's order contravened the key holding of this to address, much less overcome, the predominance defeating problem of potentially having millions of people individually attempt to prove their standing through individualized testimony and personalized evidence, all of which would be subject to cross-examination and counter-evidence. I've never seen linking standing with the predominance requirement of Rule 23 before. I'm not sure it's ever been done. Has that ever been done? Yes, in Cordova, Your Honor. This Court did that. Link standing with predominance? Yes, Your Honor. The Court held in Cordova that where individualized issues go to standing, the Court before certification must address and overcome those predominance issues. The Court reversed in Cordova for precisely that reason. Let me tell you what my concern is in this case. The judge here, the district judge relied on some expert testimony regarding damages. He made it clear that he retains the option to decertify the class if the specifics of the damages calculation becomes overly burdensome or individualized. It seems to me that your argument now is premature. You may have a chance now, maybe later. Your Honor . . . Can you cite any authority that the Court can't do this? Yes, Cordova is, I think, the principal authority I would cite. Cordova makes clear that particularly where the issues go to standing, they have to be resolved before certification, not after. What the Court said is the reason, is the principal reason why . . . The Court can't make that determination later? No, Your Honor. In Cordova, the Court reversed and remanded and sent it back because the Court had not analyzed the predominance-defeating problem of individualized inquiries that would go to standing. That was the holding in Cordova. If I might just tell you exactly why, the Court recognized in Cordova, as other courts have, the Supreme Court has said that it is the plaintiff's burden to prove every element of Rule 23 by evidence, by proof, and that it is a rigorous analysis. What the Court said in Cordova was that it is, and I'm quoting here from page 1276, given the interwoven character of a class action, a class defined as so to improperly include uninjured class members increases the potential liability for the defendant and induces more pressure to settle. So these are issues . . . What's meant by this statement in Cordova? Quote, we do not have to address the distinct question whether every class member must demonstrate standing before a court certifies a class. The meaning of that is that the Court was reserving the question of every class member. What the Court clearly though held and consistent with other circuits is that where a great many class members lack standing, a class is, quote, overbroad and should not be certified. We have that problem here because . . . Well, the district court disagrees with you. Yes, and we believe that the Court committed error in that case because standing, of course, is a legal question. You're arguing that the Court abused its discretion in making that determination. We are, but as the Court recognized in Brown, in the class certification context, the abuse of discretion standard typically devolves into legal questions as it did in Cordova. We have here that virtually every class member is raising the same allegations that were not sufficient in Sal. There is no allegation other than one person and maybe two that anybody suffered and the 4.5 million people who were allegedly potentially subject to this breach suffered any fraudulent charges. There is absolutely no evidence of any identity theft. What we have here are really the same allegations, and I know, Judge Jofad, you wrote Sal, so I'm . . . it's with some trepidation that I try to say what Sal means since Your Honor knows more than I do. We don't have the allegations of the misuse that Sal said is required or the substantial or imminent threat of any kind of identity theft that Sal said is required. We just have an allegation that there was a data breach, and we have exactly the facts of super value, which was a case that the Court relied on heavily in Sal, in fact, endorsed and said it was following. We have exactly the same facts that were an issue in super value. We have an allegation that there was an illicit website that was selling things, but we only have one named plaintiff, Ms. Diaz, who alleges that there was any fraudulent charges. Those charges, by the way, were reimbursed, so she's not out of pocket for those charges. We have one other plaintiff, Mr. Franklin, who alleged fraudulent charges, but this is where I would say this sort of epitomizes the problems that we have here. It took us three or multiple depositions and multiple interrogatories just to determine that Mr. Franklin, contrary to the allegations of his complaint, never used a rewards card at a Chili's restaurant, did not even visit the Chili's restaurant during the at-risk period, that his card was already in the public domain as a result of an earlier breach in which he was incurring fraudulent charges before the Chili's incident, and that he never got a new number even after the first breach or the second. I only point this out by way of saying that each of these individualized inquiries is going to have to be repeated potentially 4.5 million times just to determine whether anybody is injured, whether they have causation, or whether they have damages. Let me ask you a question on the standing issue, the larger standing issue. The district court issued its opinion on April 14th of 1921, sorry, 2021. Transunion came out on June 25th of 2021. The district court issued its order before transunion. We now live in a transunion world of standing. How do we address that new world, and how do we evaluate the district court's opinion? It seems to me that transunion arguably exacerbates the standing issues that you have identified. That's exactly how I would put it. I would say the issues that we raise, the errors are even more clear in light of transunion, because transunion holds that a risk of future harm is not sufficient to give rise to standing for damages. It could arise to give standing for injunctive relief like we saw in the first case, but it would not give rise to standing for damages. While we think that the order was incorrect when it was issued, it is, if I can say so, even more incorrect in light of transunion because . . . In this case, they're seeking both damages and injunctive relief, just damages? Okay, so . . . So that there is no standing under transunion for all the reasons in addition, and if I could just get to the third point, because I think that's also . . . I mean, like I said, we have three issues. They're all three of which I think work, but the court decided that it could essentially ignore the predominance issues by . . . And you said there's no standing for unnamed class members? The only person that we would concede has even arguably met the SAL standard would be Ms. Theus, and the only reason that she's met it is because she alleged fraudulent charges. They were reimbursed, but she might have had, I don't know, an hour or so worth of mitigation or some sort of cost, and she also alleges another charge that was imposed, but she's the only one out of $4.5 million that we would even concede is arguably raised standing, but to get to the expert, if I might . . . But the district court says, well, I can make that determination later. You might win later. Cordova says you have to make it now, Your Honor, and I think Cordova is very clear that the reason you have to make it now is that we would then be . . . Brinker would then be subject to a class of potentially $4.5 million . . . Cordova says every class member. No. We're talking about a great many class members, and clearly what we have . . . and it was their burden to prove every element of Rule 23, and they did not prove that there were a great many class members withstanding. At most, they showed one person. What would the Brinker's transaction records and the FISA records establish? So the Brinker transaction records would only establish that there were credit card numbers associated with names, that's it. The FISA was a report that was commissioned, and it established . . . Right, but those records can be used to identify class members through common evidence. No, they can't, Your Honor, because the court defined the class and tried to . . . is involving people who took mitigation actions, people who incurred fraudulent charges, people who incurred lost rewards points. Let me take the last one, Your Honor. To incur a lost rewards points, you have to show, one, you used a rewards card at a Chili's. We know from Mr. Franklin's allegations, he alleged he did. We proved he didn't. You have to allege that you canceled that card. You have to allege that during the period of the cancellation, before you got a new card, you incurred some other fraudulent . . . lost rewards cards opportunities, and to try to get to the third point, the judge decided to paper over all of that by saying, well, we're going to award the same average amount to everybody, regardless of whether they even suffered the damage. So, for example, Mr. Franklin gets to get an award for a lost rewards cards opportunity, even though he didn't use a rewards card at all at Chili's. That violates not only Article 3, but Rule 23, and Brinker's Rights under the Rules Enabling Act, due process, the Seventh Amendment . . . Is that your third . . . That's the third point, Your Honor, yes. It's the award of damages to class members, without regard to whether they've suffered damage or the amount of damage. Yes, this averaging, which is based on Tyson's Foods, and I can go into it, but Tyson's Foods is a very, very specific case. This is much more like Walmart, which is basically a trial by formula, and that's not . . . Can I ask you, since I'm apparently asking very broad questions in this case, how do we deal with the fact that we live in a data breach world, and in fact, one of your name plaintiffs, you have raised an issue that he did not use the card at Chili's during the appropriate time, and in fact, he had arguably had his credit card information stolen at another store through another data breach. It feels like every day we learn about more and more institutions who suffer data breaches. How do we figure out if any class member actually suffered a data breach? The only way we can do it is by asking them, Your Honor, and having them give testimony and evidence, and that's why we can't . . . How do they know? If my credit card is misused, and I'm sure that most people have had that situation and the credit card company shuts it down, how do you know where the information, what breach caused the theft of information? You don't always, Your Honor, but the good news is that for the vast, vast, vast majority of people, the fraudulent charges will be the ones that end up really being out here, and it's not the consumers. The only people who really, frankly, would win in this case would be the lawyers. I've had it happen, Your Honor. You've probably had it happen, Your Honor, and my bank covered them just like everyone else's. If there is any other expense out there, you can probably contact the bank, and they'll take care of that as well. If you can figure it out where the breach came from, when we gave notice to who we could give notice to, and we said, come forward and if you have a problem, talk to us, but what you can't do is certify a class, and no court before this one had ever certified a consumer class in a contested data breach involving a payment card. The reason is just because of all of what we've said. There are too many individualized inquiries. You'd have to line up 4.5 million people. I know I'm over my time, Your Honor, but the First Circuit, I think, said it best in Asicall, and I don't want to read too much, but it said, the inefficiency of class certification can be pictured by lining up thousands of class mentors waiting for their turn to offer testimony and evidence on individual issues. That's what we have. Unfairness is equally well pictured in an attempt to eliminate an inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues, and that's what the district court did here. All right. We have the argument. All right. Thank you so much. Ms. Martin. May it please the court, Gene Martin, for the class here. There are so many places to start, but I want to start with one of the last comments that Mr. Franklin made. Many of us in this room may have had a data breach. We may have had fraudulent charges to our accounts. Most of us in this courtroom are probably fortunate enough that we can bear the expense of that fraudulent charge, those fraudulent charges, until they are reimbursed by our bank, but some people aren't so fortunate. We have 4.5 million people here who are not so fortunate. We have named class reps, named plaintiffs here who could not bear those fraudulent charges. They didn't have enough money in their account to bear those fraudulent charges. We cannot lose sight of the fact that it is the consumers here that are hurt. It is not the banks. It is not the company that turns a blind eye to security vulnerabilities that they knew about and failed to do anything about. In terms of the argument by Brinker, Cordova does not stand for what is proclaimed. In fact, Cordova at page 1273 said that named plaintiffs must allege and show that they identified members of the class. No more is required at the class certification stage. That is what this court said. This court in the Cordova case reversed the class certification because it found that the district court had abused its discretion because it failed to even conduct a prominence test. It failed to conduct a traceability test. That's what this court said was the abuse of discretion. At no point in time in the briefing has Brinker showed how Judge Corrigan, through his rigorous analysis, failed to consider the correct law or how he may have misapprehended the facts. They simply have not done that. They may not like his analysis. They may not like the conclusion. You may not agree with his conclusion, but the requirement is that he conduct the rigorous analysis, that he apply the correct law and he not misapprehend the facts. That's exactly what he did. Judge Branch, you pointed out, we had a hearing on this case on the motion for class certification on February 25th. Judge Choflat wrote the opinion in Tau that came out just twenty-one days prior to. The very first question out of the box from Judge Corrigan was to me and it was, does Sal apply and how does Mr. Steinmetz have standing under Sal? He went through that analysis. He looked at Sal. He looked at Maransky. He looked at Cordoba. He did not have the benefit of Equifax or TransUnion, but contrary to the appellants, we would say that this case fits in the paradigm of those prior decisions. This case, in our opinion and it's our argument, it presents the facts that Judge Choflat, you were looking for in Sal. This court was looking for even in Maransky, which was a fact of case, not a data breach case. We cannot lose sight of the fact that the cards, 4.5 million cards, ended up for sale on JokerStash, which was at the time a well-known dark web site for criminals. It has since been Brinker's process server had to call them and say, we have 4.5 million cards that are linked to Brinker transactions that have shown up for sale. If that is not misuse, I don't know what is. I don't know what else this court is looking for. Again, we say that these facts present exactly what the court was looking for in Maransky, was exactly what the court was looking for in Sal.  . .     . . . . . . . . . . . . . . . How do you deal with TransUnion, which did issue post after Judge Corrigan's opinion in this case? As opposing counsel has aptly noted, we now have TransUnion saying the risk of future harm on its own does not support Article III standing for the damages claim, perhaps for injunctive relief, but we're talking about damages. You're correct, Your Honor. Judge Corrigan did not have the benefit of that decision. We are currently living in a TransUnion world, but TransUnion is a quite different scenario in that the plaintiffs there were looking for a statutory violation and statutory damages. That is not the case here. The case was also at a different procedural level. TransUnion had gone to trial, so the Supreme Court was looking at it from the perspective of what was presented at trial and whether the plaintiffs had met their burden at trial. It's very important to note, Your Honor, that TransUnion says the disclosure of private information is an intangible, concrete harm that satisfies Article III standing. There were, I think, roughly 1,600 people that the Supreme Court did say had standing because they were the ones whose information incorrect file marked as a terrorist was provided to third parties. That is the situation we have here. We have 4.5 million cards that were posted for sale that affected 4.5 million customers. We have named plaintiffs that have fraudulent charges on their account. We have Mr. Steinmetz that although he did not have a fraudulent charge on his account, he did undertake mitigation efforts. Based on all the cases, we would say that the risk was sufficient to warrant the mitigation efforts. In TransUnion, as you correctly note, their disclosure was the harm, but TransUnion was potential terrorist. In fact, disclosing that to other people was necessarily the harm. But here, we have a situation where the information has been stolen and now it's on the dark web. What we're fighting over, what you guys are fighting over right now, is whether that's sufficient misuse. Have we moved off of the risk of future harm into actual harm? There's a lot of stuff on the dark web. Are you suggesting that not all of it gets purchased and then used to conduct fraudulent charges? Is it your position that the mere fact that this information is on the dark web, that is in fact concrete harm? Even if it's never sold, no one ever has a fraudulent charge, the mere fact that this data breach, that all those credit card numbers were dumped on the dark web, even if they're never sold, that's still harm? Your Honor, we would contend that that is misuse. That is enough to raise the risk level to warrant mitigation efforts as supported by Sal, as supported by Equifax. However, that's not where Judge Corrigan stood here. Judge Corrigan, because he was going through the inquiry, because the defendants raised at the oral argument, don't forget Sal. You need to take into account Sal and reflect the predominance within the class definition because it's too broad. Judge Corrigan then limited . . . he used his discretion to refund the class so that it required additional efforts. Under your argument that once it's on the dark web, that's harm, would the plaintiffs have to know their information is on the dark web? What if they actually don't know it's on the dark web and it's never sold to anybody who institutes fraudulent charges on their account? Does that person have standing? I would like to make one clarification, Your Honor, because there is a big difference here. It is a distinction that has a big difference. Your information is probably somewhere on the dark web. Some of my information may be on the dark web. In this particular situation, under these facts, 4.5 million cards linked to Brinker were on the dark web. It was not a matter of just Gene Martin's credit card. It was Gene Martin's credit card that had been used at Brinker. That information was up there known to be linked to Brinker. That is a distinction that needs to be noted here. That's how it's different than other cases where plaintiffs have said, well, my information is on the dark web because there's never been any evidence that it was actually linked to the defendant. As Mr. Franklin said, in the super value case, there was some of that, but super value was different in that super value did not have full card information. It only had the last four digits, which even under FACTA is allowed. Going back to my question, would a plaintiff who does not know that even their credit card is on the dark web associated with the Brinker data breach and no fraudulent charges ever occur on that person's account? Has that person suffered concrete harm? Your Honor, under Sal, we simply need to show that there is a class member who has had fraudulent activity and we have that. Sal and other cases have said as long as there is evidence of some misuse, then the others that take mitigation efforts, the others that know that they have something wrong, they have standing. I think that that's an issue that's going to continue to be debated because unfortunately, the notice and the information regarding these breaches is solely in the hands of the defendants. If the defendants know that they can get away with being negligent, with having vulnerabilities in their systems, as long as they don't tell anyone, we're going to see more of that. Judge Wilson, I'd like to go to a point that you made about common evidence of liability. You're exactly correct that we can use the five-serve records. We can use records from first data to ascertain and identify these individuals. It may not be an easy process, but it's easily done. It can be done through common evidence. For predominance, the issue is, are there common issues with regards to liability? Here, we have a lot of liability issues to go through. I wish it were as simple as Brinker makes it out that we're all ready to damages, but we're not there yet. Judge Wilson, as you pointed out, Judge Corrigan said, I'm going through this analysis. I believe the plaintiffs have met it for now. I'm refining the definition to make sure that we meet those predominance requirements that we're going to see in the future when we get to recovery. He certified the class, but he noted that I can always come back and decertify this. That is what he is in his discretion. He's the one that's going to have to manage this at the end of the day. He is the one that's going to monitor this. He's going to keep an eye on it. He has a lot of things in his discretion. As you will know with the class action trial, he can bifurcate damages and liability. He can appoint a special master at the damages and he has a lot of discretion. A final point with regards to the damages, defendants have mischaracterized our damages methodology. The loss reward points is not about rewarding people for reward points, whether or not they had them. It is a sample to be used since we may not have the appropriate data. Thank you, Ms. Martin. Mr. Franklin, you've reserved some time for rebuttal. Thank you, Your Honor. First, I'd just like to clarify a few evidentiary points. I think there was an indication, maybe not, that 4.5 million people suffered fraudulent charges or evidence of that. The reason there's no evidence is in order for us to know who has a fraudulent charge or who took mitigation actions or who had out-of-pocket costs, we have to ask each one of them. We did that with the main plaintiffs. We found out some of them were actually not telling the truth and we had to have multiple depositions. You'd have to do that 4.5 million times. There is no evidence that all 4.5 million cards were on the dark web. All the evidence is that some of them were at page 26 to 27 of the hearing transcript. Plaintiff's counsel conceded that they did not even know if the named plaintiff's information was on the dark web. In any event, that's not the misuse that Sal requires. It's not even used. SuperValue had the exact same allegation. In my reading of SuperValue, all of the card information plus a lot more was at issue in that case. I would also say in TransUnion, the standing existed because there was defamatory information that was published to third parties, false information about the person being a terrorist. Nothing about a posting, if it even occurred, of credit card information on the dark web would rise to that kind of level. I would add that their expert has no category of damages that's related to any kind of defamation or anything like that. More importantly, the district court did not propose to do that either. Can I ask you a quick question about the district court's classification order? In the negligence claim, not looking at the California state claim, the district court said the class will be all persons residing in the U.S. who made a credit or debit purchase at any affected Chili's location during the period who, one, had their data accessed by cyber criminals and then who incurred reasonable expenses or time spent. What are we supposed to make of the statement, had their data accessed by cyber criminals? I believe he's referring to the dark web posting there, Your Honor. That, we believe, is an individualized issue as well. Everybody's got to come forward and say, hey, my card was on the board and say, yeah, and I took mitigation actions because of that. Are you conceding that if a plaintiff's information is on the dark web, that then took mitigation efforts that that plaintiff has standing? No, Your Honor, because the dark web posting is not the kind of misuse. It's certainly under transunion. It's, at most, a risk of future harm. It is not actually . . . Perhaps an elevated risk. Somewhat, but they did not prove that, Your Honor. I would note the amicus brief by the Chamber of Commerce has a study saying that posting on the dark web has no correlation to fraudulent charges. It was their obligation as plaintiffs to prove every element of Rule 23, and they did not prove that there was even an elevated risk. Even if it was elevated, it has to be certainly impending, even if you want to say that that wasn't overruled by transunion. It has to be certainly impending or a substantial risk, as Joe Flatt's opinion in Stau for the Court makes clear. None of that here. What we have at the end of the day is a situation where just to prove standing injury causation damages, you have to line up 4.5 million people and ask them all of the same questions that we ask these named plaintiffs to figure out. Did they suffer an injury? If so, how much? Did they suffer it because of this breach or some other breach? Did they do it because of the dark web posting or some other reason? It's a prototypical example, Your Honor, of why the rigorous analysis under Rule 23 does not happen. Judge Wilson, with due respect, it is not the law that you can certify first and ask questions later. You have to, under Cordova, ask the questions first before certification because of how important that is to the case. We would ask that the court reverse the order and direct the case to proceed only as an individual action, if at all. Thank you. All right. Thank you, Mr. Franklin and Ms. Martin. The next case.